# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN FEATHERSTONE, | ) | |
| | ) | No. 13 CV 6559 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | January 13, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Brian Featherstone, a 37-year-old former painter and cabinetmaker, applied for Disability Insurance Benefits ("DIB") based on his claim that orthopedic injuries he suffered in a 2009 motorcycle accident have left him unable to work. After an administrative law judge ("ALJ") denied his application and the Appeals Council declined to review that decision, Featherstone filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Featherstone's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed:

## Procedural History

Featherstone applied for DIB in January 2011, claiming a disability onset date of November 7, 2009. (Administrative Record ("A.R.") 160.) After his claim was denied initially and upon reconsideration, (id. at 98, 110), Featherstone

requested and was granted a hearing before an ALJ. That hearing took place on June 12, 2012. (Id. at 30-87.) On June 29, 2012, the presiding ALJ concluded that Featherstone is not disabled and denied his DIB application. (Id. at 24-25.) When the Appeals Council declined Featherstone's request for review, (id. at 1-7), the ALJ's ruling became the final decision of the Commissioner of Social Security Administration, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Featherstone filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 5; R. 10).

## Facts

On November 7, 2009, Featherstone sustained multiple injuries when the motorcycle he was riding collided with an SUV. (A.R. 256.) He suffered a dislocated and fractured right shoulder and multiple complicated fractures in his left leg. (Id. at 288.) He spent over a week in the hospital, during which he underwent several surgeries designed to stabilize his fractured bones. (Id. at 306-07.) In the years since he has undergone occupational therapy, physical therapy, and additional surgeries to treat his injuries and to reduce his lingering pain. At his hearing before the ALJ, Featherstone submitted documentary and testimonial evidence in support of his claim that he is rendered disabled by ongoing pain from his injuries, as well as back pain related to degenerative disc disease.

**A.      Medical Evidence**

After his motorcycle accident in November 2009, Featherstone arrived by ambulance at an emergency room at Provena St. Joseph Medical Center, where diagnostic tests showed that he had suffered fractures in his tibia, fibular shaft, and fibula above the ankle, and that he had sustained a dislocated and fractured shoulder.   (A.R. 256, 259, 261.)   After he consulted with a physician it was determined that he should be transferred to another hospital for surgery, given the "very complex" nature of his fractures.  (Id. at 256-57, 288-89.)  When he arrived at Advocate Good Samaritan Hospital he was taken into surgery to repair his right shoulder, a dislocated left fifth toe, and his open tibial and femur fractures.  (Id. at 290-91, 316.)  Two days later he underwent another surgery involving the insertion of rods and screws to stabilize his tibia and fibula.  (Id. at 320.)  Five days after that he underwent another shoulder surgery involving internal fixation of the fracture using a plate and screws.  (Id. at 322.)  He was discharged from Good Samaritan in medically stable condition nine days after he arrived and transferred to a rehabilitation center.  (Id. at 308.)

Featherstone spent two weeks undergoing occupational and physical therapy at the in-patient rehabilitation center, with the goals of increasing his mobility and his ability to engage in self-care.  (Id. at 344, 360, 363.)  When the rehabilitation center discharged him in early December 2009, Featherstone's treatment providers described him as having made "significant gains," with "well-controlled" pain and with the ability to walk for 120 feet using a walker.  (Id. at 344.)  He was fitted for a

special casting shoe to correct a left leg length disparity and discharged to outpatient orthopedic care.  (Id.)

In April 2010 Featherstone was still using a front-wheeled walker and experiencing left knee pain, although he reported feeling "much better overall."  (Id. at 500.)  By May he had developed hip pain from using his casting shoe, (id. at 461), but by June his orthopedist described him as having "had so far quite a remarkable recovery," noting that he was not using assistive devices to ambulate, (id. at 458).  Later that summer, however, his doctors noted that Featherstone was using a cane to walk and that he was experiencing pain in his left knee despite taking several pain killers.  (Id. at 454, 456.)  He was also walking with a noticeable limp.  (Id. at 596.)

In October 2010 x-rays revealed what Featherstone's doctors thought might be a "delayed union" of his mid-femur, and opined that the locking screws around his knee may be causing his ongoing knee pain.  (Id. at 514.)  That December his doctors noted that Featherstone was "doing well" and did "not have pain as such," although his knee was sore and he was using a cane.  (Id. at 515.)  By February 2011 his doctors noted that he had "a little bit of pain" and stiffness in his knee, but speculated that he might be physically "strong enough" to return to some form of work by late spring or summer.  (Id. at 593.)

Featherstone's recovery progress took a hit in March 2011 when he had an acute onset of increased pain in his left thigh, leading to tests showing that the proximal tip of his intramedullary nail had broken and that there was nonunion in

his fracture. (Id. at 545.) Surgeons removed the nail and replaced it with a femoral nail of larger diameter before discharging him to outpatient care. (Id.) Two weeks after this surgery Featherstone reported having very little pain, if any, and returned to physical therapy. (Id. at 591.) In April 2011 his orthopedist noted that he was doing "quite well," that his thigh pain was gone, and that he was using a cane not so much to alleviate pain, but to deal with his leg-length discrepancy. (Id. at 589.) His doctor encouraged him to walk without a cane to help him strengthen his left hip abductor. (Id. at 588.)

In April 2011 Featherstone underwent a consultative examination with Dr. Kimberly Middleton. (Id. at 572.) Dr. Middleton noted that Featherstone limped and was unable to walk 50 feet without his cane. (Id.) She opined that he would have difficulty ambulating, balancing, using stairs, or standing for prolonged periods. (Id. at 573.) Her examination revealed that he had full range of motion in his right shoulder. (Id. at 574, 580.) But in opining on his residual functional capacity ("RFC"), Dr. Middleton wrote that Featherstone would be limited with repetitive overhead reaching, pushing, and pulling with his right shoulder. (Id. at 573.)

In May and August 2011, two state consulting physicians, Drs. James Hinchen and Francis Vincent, reviewed Featherstone's medical file, including Dr. Middleton's report, and gave opinions regarding his RFC. Dr. Hinchen opined that Featherstone has limitations including standing and walking for only two hours, sitting for six hours a day, lifting and carrying only 20 pounds occasionally

and 10 pounds frequently, and reaching in front or overhead with his right arm. (Id. at 88-97.) Dr. Vincent's RFC opinion mirrored Dr. Hinchen's in all relevant respects. (Id. at 106.)

In the fall of 2011 Featherstone underwent yet another surgery, this time to remove the intramedullary nail in his left tibia, after which Featherstone appeared to have "a wonderful result with no pain." (Id. at 630, 645.) But shortly thereafter, Featherstone described having "excruciating" pain in his tibia. (Id. at 650.) In December 2011 he underwent surgery for what his doctor described as "left tibial malunion," meaning the segmental fracture in his tibia collapsed and required a new nail and screw. (Id. at 628-29.) But by January 2012 Featherstone's orthopedist thought that his tibia looked "excellent" and that his alignment was "nicely maintained." (Id. at 645.) The following month his doctor noted that there "is no question" that Featherstone was walking better and that he was not experiencing any pain while at rest. (Id. at 643.)

Beginning in February 2012 the medical record documents that Featherstone sought treatment for low-back pain related to degenerative disc disease. An MRI that month showed disc protrusion and bulges in Featherstone's lumbar spine, which were encroaching on his nerve roots. (Id. at 614-15.) His orthopedist attributed his lumbar spine pain to a herniated disc, and in April 2012 administered two epidural steroid injections to ease his low back and hip pain. (Id. at 641, 666-68, 674.)

**B.    Featherstone's Hearing Testimony**

At his hearing before the ALJ, Featherstone answered the ALJ's questions regarding how his pain impacts his daily life.  Featherstone testified that although he still has some problems with his right shoulder, the pain in his leg and back is what keeps him from working.  (A.R. 34-35.)  At the time of the hearing Featherstone had received three cortisone shots for back pain and had just started physical therapy to address that pain, but he said those treatments had not yet been helpful. (Id. at 35.)  Featherstone testified that right after his accident he used a walker for "probably six months" and that he used crutches or a walker after each of his surgeries for a couple of months.  (Id. at 36-37.)  He has not had any treatment for his shoulder since his last surgery and uses his right hand to hold his cane. (Id. at 66-67.)

As for his daily activities, Featherstone testified that he lives at home with his wife and elementary-school aged son, who do most of the household chores.  (Id. at 37-38, 44.)  Featherstone said that he drives to run errands and to attend medical appointments, but he gets uncomfortable with long distance drives.  (Id. at 39-40.)  He also will accompany his wife to the grocery store and lean on the cart as they shop.  (Id. at 51.)  Featherstone testified that he goes to a campground to spend time with friends usually every other weekend.  (Id. at 46.)  But at home, Featherstone usually sits in a recliner because he can sit in a regular chair for only 20 minutes at a time.  (Id.)  He takes two kinds of pain medicine and uses a cane both inside his house and when he goes out.  (Id. at 40-41.)  During the day Featherstone does his physical therapy exercises, takes hot showers to relieve his back pain, and watches

television. (Id. at 41, 43-44.) He might wash pots and pans sometimes, but he generally does not do many household chores, although he admitted to using a self-propelled lawn mower. (Id. at 44-45.) Featherstone explained that he takes breaks while mowing and is "miserable" when that chore is done. (Id. at 45, 48.)

## C. Vocational Expert's Testimony

Vocational Expert ("VE") Aimee Mowery testified at the hearing and answered the ALJ's questions regarding the kinds of jobs a hypothetical individual with certain functional limitations could perform. The VE testified that there would be no unskilled jobs available at the sedentary level to a person who could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk for no more than two hours, sit for six hours, and only occasionally reach to the front or overhead with his right arm. (A.R. 60-62.) But when the ALJ proposed removing the reaching restrictions from the hypothetical, the VE testified that such a person could perform jobs including information clerk, order clerk, and interview clerk. (Id. at 62-63.) The VE testified that a person could still perform those jobs if he needed to use a cane when standing and walking, and needed to stand or walk for one minute out of every twenty minutes. (Id. at 63-65.) But if the hypothetical person had to take breaks throughout the day, could sit for only two hours, and was limited to lifting no more than eight pounds, there would be no jobs available. (Id. at 65.)

## D. The ALJ's Decision

On June 29, 2012, the ALJ issued her decision concluding that Featherstone is not disabled and therefore not entitled to DIB. (A.R. 25.) In applying the

standard five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a)(4);

*Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found at step one that

Featherstone had not engaged in substantial gainful activity since his alleged onset

date and at step two that he suffers from severe impairments including "left leg

fracture post surgical interventions and degenerative disc disease of the lumbar

spine," (A.R. 14). At step three the ALJ considered whether Featherstone's

impairments meet or equal Listing 1.04 for disorders of the spine, or 1.06 for

fracture of the femur or tibia, but concluded that he does not meet those Listings'

requirements regarding ineffective ambulation. (Id. at 15-16.) Before turning to

step four the ALJ determined that Featherstone has an RFC which includes, in

relevant part, the ability to perform sedentary to light work except that he can lift

or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for no

more than two hours and sit for a total of about six hours in an eight-hour day,

must use a cane in one hand while standing or walking, and needs one-minute

breaks every twenty minutes to stand or walk. (Id. at 16.) The ALJ did not include

any reaching restrictions in the RFC. (Id.) At step four, the ALJ concluded that

Featherstone is unable to perform his past work as a cabinetmaker or painter, but

at step five she determined that he can perform other jobs that exist in significant

numbers, including information clerk, order clerk, and interview clerk. (Id. at 22-

34.) Accordingly, the ALJ concluded that Featherstone is not disabled and denied

his DIB application. (Id. at 24-25.)

# Analysis

Featherstone argues that the ALJ committed reversible error in failing to adequately explain her conclusion that he does not meet Listing 1.06, in declining to incorporate reaching limits into the RFC assessment, and in evaluating his credibility. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (quotation and citation omitted). Under that standard, the court will not substitute its judgment for the ALJ's or reweigh the evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Instead, the court will ensure that the ALJ built a "logical bridge from the evidence" to her conclusion that the claimant is not disabled, explaining "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotation and citation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (internal quotation and citation omitted).

## A.    The ALJ's Step-Three Analysis

Featherstone first argues that the ALJ's decision must be reversed because, according to him, she failed to adequately explain her step-three determination that

his condition does not meet or equal Listing 1.06, which applies to fractures of the tibia and fibula. The listing of impairments set out in the Social Security Administration's regulations describes impairments that it considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). The claimant bears the burden of proving that his condition meets or medically equals every criterion set forth in the relevant listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Contrary to Featherstone's argument, the ALJ adequately explained her finding that Featherstone's condition does not meet or equal Listing 1.06. Listing 1.06 describes the fracture of, among other things, the femur or tibia, where solid union is not evident and where the claimant is unable to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.06. The inability to ambulate effectively is defined in section 1.00B2b as "an extreme limitation in the ability to walk . . . that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. § 1.00B2b. Importantly for this case, the definition requires "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. The Listing goes on to provide examples of ineffective ambulation, including:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as

shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Id. In discussing Listing 1.06, the ALJ explicitly considered whether Featherstone is able to ambulate effectively, and properly concluded that his use of a single cane does not meet the Listing's definition. (A.R. 16.) Specifically, she found that Featherstone's brief, post-surgery stints using a walker or crutches did not meet the regulation's 12-month durational requirement because he never used either for longer than 6 months. (Id.) She also properly pointed out that the use of a single cane does not prevent him from using both of his arms or otherwise preclude him from going out independently to shop or from performing chores like mowing the lawn. (Id.) Because those observations find support in the record, Featherstone has not shown that the ALJ erred in concluding that he does not meet or medically equal the Listing. *See Filus v. Astrue*, 694 F.3d 863, 867-68 (7th Cir. 2012).

Featherstone's argument rests on his assertion that the ALJ failed to adequately explain her step-three finding, because according to him, the ALJ did not "explain how she considered ineffective ambulation as it was defined in the Regulation." (R. 20, Pl.'s Mem. at 9.) But that simply is not true. The ALJ thoroughly explained her finding that Featherstone retains the ability to ambulate effectively in the course of her discussion of Listing 1.04, and then explicitly referenced the same arguments and facts in considering Listing 1.06. (A.R. 16.) Featherstone argues that she should have discussed his profound limp, poor balance, and leg weakness, but he fails to explain how any of those factors meet the criteria set forth in the Listing describing ineffective ambulation. Nor does he cite

any evidence to establish that he is unable to walk for a block at a reasonable pace when he uses his cane. And in any event, as the ALJ pointed out, both of the consulting physicians who offered RFC opinions considered whether Featherstone qualifies for benefits under Listing 1.06 and found that he does not. (Id. at 15, 92-93, 104.) Because Featherstone has not pointed to any conflicting opinion from another physician, the ALJ did not err in accepting the consulting physicians' opinions on this issue. *See Filus*, 694 F.3d at 867. In short, the ALJ adequately explained that Featherstone's use of a cane did not preclude him from performing daily activities, and that explanation is supported by substantial record evidence. *See Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) (declining to find ALJ's step-three analysis perfunctory even though ALJ did not refer to relevant listing, where decision as a whole provided support for conclusion).

## B.    The RFC Finding

Next Featherstone argues that in excluding any reaching limitations from the RFC assessment, the ALJ improperly substituted her own opinion regarding his medical impairments for the opinions of the three consulting physicians. He points out that consulting examiner Dr. Middleton opined that Featherstone is limited with repetitive overhead reaching, pushing, and pulling with his right arm, and that Drs. Hinchen and Vincent, the two state consulting physicians, adopted that opinion. (R. 20, Pl.'s Mem. at 11.) Featherstone argues that because the ALJ rejected all three opinions, she was left with an "evidentiary deficit," and according

to him, she impermissibly filled that void with her own lay opinion when she declined to include any reaching limitations in the RFC assessment. (Id. at 12.)

Although it is true that an ALJ may not "play doctor" in the sense that she may not make her own medical findings based on lay intuitions, *see Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), the ALJ is allowed to reject physicians' opinions if she relies on other medical evidence and testimony and explains why that evidence points away from the opinions, *see Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992) (noting that ALJ plays doctor where she rejects doctors' opinions without relying on another medical report or opinion). In other words, an ALJ is only impermissibly "playing doctor" when she builds an RFC based on unsupported assumptions instead of relevant evidence. *See Simila v. Astrue*, 573 F.3d 503, 514-15 (7th Cir. 2009) (rejecting argument that ALJ played doctor when she put aside psychologist's opinion even though no other expert opinion existed in record on which to base findings). But as the regulations make clear, the determination of the RFC is an issue reserved for the Commissioner, and in determining that RFC, the ALJ is required to consider all of the relevant medical and nonmedical evidence, including the claimant's own testimony. 20 C.F.R. § 404.1546(c); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Here, in rejecting Dr. Middleton's opinion regarding Featherstone's reaching limitation, the ALJ explained that this limitation appeared to be based only on his subjective complaints and that they conflict with the medical record which showed no ongoing problems or treatment for his right shoulder after he recovered from

surgery. (A.R. 15, 20.) As the ALJ pointed out, Dr. Middleton's physical examination showed that Featherstone had no limitations in his range of motion in his right shoulder, (id.), so the ALJ had reason to conclude that Dr. Middleton's RFC in this respect rested on nothing more than Featherstone's subjective complaints at the time. An ALJ is entitled to disregard a physician's opinion where it is based on nothing more than a claimant's subjective complaints. *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013). The ALJ further explained that she rejected the consulting physicians' opinions in this regard because they did not have the opportunity to review the whole record or hear Featherstone's testimony, both of which suggested that he has no significant ongoing difficulties with his right shoulder. (A.R. 22.) As the ALJ wrote, even Featherstone admitted that he does not have any real problems with his shoulder, and that his disability claim is based on problems with his leg. (Id. at 15.) The record confirms that at the time of the hearing Featherstone had not had any recent physical therapy related to his shoulder, nor had he received any pain injections or other treatment for shoulder pain. Because the ALJ pointed to this evidence to explain the RFC, her explanation is sufficient to ensure the court that she did not substitute her own judgment for that of the consulting physicians. *See Diaz*, 55 F.3d at 306 n.2 (noting that ALJ does not make impermissible "medical judgment" in crafting RFC based on evidence other than physicians' opinions). Rather, she considered the record as a whole, including Featherstone's testimony, and concluded that there is a conflict between that record and Dr. Middleton's opinion (which the two consulting physicians

adopted). (A.R. 15, 20, 22, 92, 106.) She then resolved that conflict and determined that the evidence as a whole did not call for the inclusion of reaching restriction in Featherstone's RFC. (Id. at 20, 22.) Thus she discharged her duty to build Featherstone's RFC based on medical and testimonial evidence, and not on her lay intuition. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence."). Accordingly, Featherstone has not shown that she committed reversible error in formulating the RFC.

## C.     The Credibility Assessment

Finally, Featherstone argues that the ALJ committed multiple errors in assessing his credibility. This court is required to be "extremely deferential" in reviewing the ALJ's credibility assessments and will overturn a credibility finding only where it is "patently wrong." *See Bates*, 736 F.3d at 1098 (quotation and citation omitted); *see also Stepp*, 795 F.3d at 720. That standard requires this court to give the ALJ's determination "a commonsensical reading," rather than nitpicking it "for inconsistencies or contradictions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). As long as the ALJ's credibility assessment is "reasoned and supported," it must be upheld. *See Shideler*, 688 F.3d at 311.

Here the ALJ provided numerous well-supported reasons for discounting Featherstone's testimony, including a mismatch between his description of his symptoms and his daily activities, his failure to report the limitations he described at the hearing to doctors, and a lack of support in the objective medical evidence for

the level of limitation he described. (A.R. 17.) Featherstone attacks the ALJ's credibility assessment in part by pointing out that she employed the now-discredited "backwards" boilerplate stating that his "symptoms are not credible to the extent they are inconsistent with the above [RFC]." (Id. at 21.) As he points out, the Seventh Circuit has criticized this language as being worse than meaningless, *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), but it has also held that as long as the ALJ otherwise provides adequate reasons for her credibility conclusion, "the inclusion of this language can be harmless," *Filus*, 694 F.3d at 868. The ALJ included such reasons here, so the court will examine them. *See id.*

Featherstone challenges the ALJ's decision to discount his pain complaints based in part on her determination that his claim that pain prevents him from doing any work is unsupported by the objective medical evidence and on his treatment record, which she found supportive of a finding that he can perform work within the limitations set forth in the RFC. (A.R. 17-18, 21.) Although an ALJ may not discount a claimant's credibility regarding pain allegations based solely on a lack of supporting objective evidence, 20 C.F.R. § 404.1529(c)(2), the ALJ may consider that factor "as probative of the claimant's credibility," *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Jones*, 623 F.3d at 1161 (noting that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration"). Featherstone argues that the ALJ failed to consider how the objective medical records support his pain allegations and other relevant factors

like the effectiveness of his medication, the treatments he has received, and the other measures he uses to relieve his symptoms. *See* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). But the ALJ touched on these factors over the course of her lengthy RFC analysis, acknowledging evidence that both supported and detracted from his claims. For example, although the ALJ acknowledged that Featherstone's ongoing recovery supported his pain allegations to some extent, she pointed out that his treatment records demonstrate that he was progressing and improving over time. She determined that his doctors' notations of his full-weight bearing status are inconsistent with his testimony. (A.R. 20.) The ALJ recognized that immediately after the accident and his initial surgeries he was more limited, but concluded that within 12 months he had improved to a level consistent with the limitations in the RFC. (Id. at 21-22.) She took note that Featherstone had recently received steroid injections to relieve his back pain, but observed that at the time he was able to walk with a normal gait and without his cane. (Id. at 21.) The ALJ also discussed Featherstone's pain medications and their lack of side effects. (Id. at 17.) In these ways, the ALJ engaged with the correct factors in analyzing whether the objective record supports the full extent of Featherstone's allegations.

Featherstone next attacks the ALJ's explanation that she found that his description of his activities of daily living support the conclusion that he can perform some work, arguing that she impermissibly equated those activities with the demands of full-time work, without considering his ability to take breaks and recover at his own pace with respect to his daily activities. But here the ALJ did

not equate his activities with full-time work, she simply weighed them as one factor in assessing the credibility of his pain complaints. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating that agency will consider daily activities in evaluating severity of claimant's symptoms); *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) (upholding ALJ's reasoning that daily activities undermined claimant's testimony regarding extent of her symptoms); *Shumaker v. Astrue*, No. 15-1923, __ Fed. App'x __, 2015 WL 8479517, at *4 (7th Cir. Dec. 10, 2015) (noting that ALJ may evaluate daily activities against "asserted impairments in assessing whether [claimant] was exaggerating the effects of her impairments"). The ALJ explained that Featherstone's complaints are contradicted to some extent by his admission that he mows the lawn, drives, goes out daily, shops, and regularly socializes with friends in a campground. (A.R. 17.) The ALJ concluded that these "normal activities" are consistent with an ability to perform work at a lighter level than his previous jobs. (Id.) Because it was permissible for the ALJ to evaluate Featherstone's daily activities as part of the credibility analysis, *see* 20 C.F.R. § 404.1529(c)(3)(i), and because this court's function is not to reweigh that evidence, *see Shideler*, 688 F.3d at 310-11, the court finds no error in the ALJ's daily activities discussion.

Featherstone also points out that Dr. Hinchen noted in his RFC opinion that Featherstone's pain complaints are supported by the objective evidence, and argues that the ALJ's failure to acknowledge that notation conflicts with agency regulations. But the ALJ wrote that she gave Dr. Hinchen's opinions some weight and explained that she adopted the recommendations he made that are supported

by the record, while noting that Dr. Hinchen did not have the opportunity to review the entire record before issuing his opinion. (A.R. 22.) Although the ALJ could have done more to explain why she disagreed with Dr. Hinchen's credibility assessment in particular, her explanation regarding his overall opinion satisfies the court that she weighed it appropriately and discounted it for reasons that are supported by the record. Given that the ALJ provided other supported reasons for her adverse credibility findings, the ALJ's failure to wrestle more explicitly with Dr. Hinchen's credibility notation does not require a remand. *See Shideler*, 688 F.3d at 312 (noting that credibility determinations need not be perfect to survive judicial review); *Berger*, 516 F.3d at 545-46 (noting that ALJ's decision stands even if it is not flawless, as long as there is some support for it in the record); *Halsell v. Astrue*, 357 Fed. App'x 717, 722 (7th Cir. 2009) (noting that not all of the reasons the ALJ gives for credibility assessment have to "be valid as long as *enough* of them are" (emphasis in original)).

Lastly, Featherstone argues that the ALJ committed reversible error in failing to acknowledge his excellent work history, a factor he says the ALJ should have weighed in his favor. It is true that a good work record weighs in favor of the claimant's credibility, but as the Seventh Circuit recently acknowledged, "work history is just one factor among many, and is not dispositive." *Shumaker*, 2015 WL 8479517, at *5. Accordingly, an ALJ's silence with respect to a claimant's work history does not require reversal when the credibility determination is otherwise supported by substantial evidence. *Id.* But here, contrary to Featherstone's

argument, the ALJ did acknowledge and credit his positive work history, noting that this history was interrupted by his accident. (A.R. 17.) In short, the ALJ here thoroughly examined the medical and testimonial evidence and explained why she thought it inconsistent with the severity of the limitations Featherstone describes, and explained why she found his description of his daily activities to be out of sync with his description of the extent of his pain. Accordingly, the court cannot conclude that her credibility assessment was "patently wrong." *See Filus*, 694 F.3d at 869.

## Conclusion

For the foregoing reasons, Featherstone's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed.

**ENTER:**



_____
**Young B. Kim**
**United States Magistrate Judge**